UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JOHN DOE,                                    |          Case No.
                                             |
                    Plaintiff,               |
                                             |
        v.                                   |
                                             |
COLUMBIA UNIVERSITY,                         |
                                             |          <u>JURY TRIAL DEMANDED</u>
                    Defendant.               |
-------------------------------------------------------x

<u>COMPLAINT</u>

**PLAINTIFF JOHN DOE** (a pseudonym),[1] by his attorneys NESENOFF &
MILTENBERG LLP, as and for his Complaint against Defendant Columbia University,
respectfully alleges as follows:

<u>THE NATURE OF THIS ACTION</u>

1.      Plaintiff John Doe ("John Doe"), an expelled graduate student at Defendant
Columbia University ("Columbia"), brings this lawsuit alleging Title IX discrimination and related
state law claims.  John Doe was wrongly and falsely accused of violating Columbia's Gender-
Based Misconduct Policy and Procedures for Students governing sexual misconduct (the "Policy")
based on alleged non-consensual sexual intercourse with Jane Roe in the early morning hours of
August 26, 2017. As the result of Columbia's gender-biased, result-oriented investigation and
decision-making process, John Doe was found responsible for Policy violations and, despite a
previously unblemished disciplinary record, was permanently expelled from Columbia's graduate
program.

---

[1] Plaintiff John Doe has filed herewith a motion to proceed by pseudonym.

2.      The case arose from events during the night hours of August 25, 2017 and early morning hours of August 26, 2017, when John Doe -- who was then in his mid-twenties and had been friends with Jane Roe for over a year -- partied with Jane Roe, who was two years older.  At a dance club in Chelsea, New York City, Jane Roe was observed by one or more of Jane Roe's own eyewitnesses freely and voluntarily kissing John Doe, freely and voluntarily dancing with John Doe in a sexually explicit manner and freely and voluntarily engaging in other sexualized activities.  After 2:30 am, Jane Roe and John Doe went to John Doe's apartment, which Jane Doe admitted she did freely and voluntarily.  After entering the apartment, Jane Roe and John Doe engaged in consensual mutual foreplay in three different rooms and then they engaged in consensual sexual intercourse in three different positions. Jane Roe did not demonstrate any incapacitation, but rather demonstrated that she was a voluntary participant in each of the continuous, seemingly mutual, sexual activities.  Throughout the evening, Jane Roe did not show any difficulties in walking, or otherwise reflecting incapacitation generally. Further, Jane Roe gave verbal expression to wanting and enjoying sexual intercourse.

3.      Jane Roe later claimed that after she woke up, still disoriented and confused, she collected her things and quickly fled John Roe's.  Jane Roe also later claimed that she had a "black-out memory loss" of almost the entire time she was alone with John Doe and that she remembered almost no facts. Jane Roe thus had to recreate her after-the-fact story with the help of her cousin, her future roommate and her future boyfriend -- three individuals who were not with Jane Roe at any relevant time during the night hours of August 25, 2017 and early morning hours of August 26, 2017.

4.      Columbia's investigation and decision-making process was a one-sided, gender-biased, results-oriented process that produced an erroneous result and an excessive sanction in this

case.  Among the defects in the proceeding were: (i) the Columbia investigation team presumed that Jane Roe was telling the truth simply because she pursued her claim, a presumption that is dispositive as to guilt or innocence under a "more likely than not" standard where consent is challenged; (ii) as a result of presuming Jane Roe's story to be true, Columbia did not question Jane Roe's credibility, nor did it analyze inconsistencies and discrepancies in Jane Roe's story; (iii) as a result of presuming that John Doe's testimony was untrue where it differed from Jane Roe's testimony, Columbia did not analyze whether John Doe's testimony and Jane Roe's testimony were consistent with the objective evidence; (iv) Columbia prevented John Doe from questioning Jane Roe and refused John Doe's request for the Columbia investigation team and the Columbia hearing panel to ask about the main discrepancies between Jane Doe's narrative and the objective evidence in the record; (v) Columbia ignored the testimony of Jane Roe's witnesses which flatly contradicted Jane Roe's narrative in critical respects; (vi) Columbia gave the same weight to the testimony of Jane Doe's after-the-fact witnesses that it gave to the testimony of the three eyewitnesses, even though Jane Roe's statements to her after-the-fact witnesses were not based on her recollection of the events but, because of her "blackout memory loss," reflected the narrative Jane Roe reconstructed with the help of her three friends who were not present at any relevant time; (vii) the Columbia investigation team refused to consider expert opinions on the two medically-related issues presented by this case because John Doe had hired the experts and, at the same time, refused to hire their own expert; (viii) the Columbia hearing panel rubber-stamped the Columbia investigation team's report because it did not have the time to carefully review and consider the record; and (ix) the Columbia appellate panel summarily denied the appeal on the ground the appellate panel was not permitted to examine the facts.

     5.     To redress the erroneous result and excessive sanction, John Doe brings this action.

**THE PARTIES**

6.      John Doe is a natural person residing in New York City, New York.  John Doe attended and graduated from college with an undergraduate degree.  In August 2016, John Doe matriculated as a Columbia University graduate student.  At the time of the events relevant here, including the disciplinary proceeding, John Doe was a second-year student and had never before been involved in any other disciplinary matters.

7.      Columbia is an elite private Ivy League University located in the City and State of New York.  Upon information and belief, Columbia receives nearly $645,000,000 in federal funding for research and development and operates under a 1787 charter that places the institution under the Trustees of Columbia University ("Board of Trustees").

**JURISDICTION AND VENUE**

8.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the claims herein arise under federal law; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

9.      This Court has personal jurisdiction over Columbia on the grounds that Columbia is conducting business within the State of New York, is a resident of the State of New York and whose actions that are the subject of this action took place in the Southern District of New York.

10.      Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

[4]

<u>**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**</u>

A.     **Background: The "April 2011 Dear Colleague Letter" Of**
       <u>**The Department of Education's Office for Civil Rights.**</u>

11.     On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter," while now revoked, was in effect when Columbia's disciplinary procedures were put in place and the alleged sexual assault occurred in this case.  Before the April 2011 Dear Colleague Letter, colleges and universities generally did not use its disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the April 2011 Dear Colleague Letter.  The April 2011 Dear Colleague Letter thus provides a necessary set of background facts to this action: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

12.     The April 2011 Dear Colleague Letter (p. 1) defined discrimination on the basis of sex to include sexual harassment of students, which sexual harassment was defined to include acts of sexual violence.  The April 2011 Dear Colleague Letter provided that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

13.     The April 2011 Dear Colleague Letter effectively equated "victims" and "complainants" in sexual misconduct proceedings as women who must receive preferential treatment.  For instance, the April 2011 Dear Colleague Letter: (i) stated -- incorrectly -- that "1 in 5 women are victims of completed or attempted sexual assault while in college" (p. 2); (ii) warned that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol" (p. 2); (iii) suggested educational institutions seek grants from the U.S.

Department of Justice's Office on Violence against Women, which require institutions "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability . . ." (p. 19); and (iv) warned education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs" and asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs (p. 15).

14.     The 1 in 5 "statistic" cited by the April 2011 Dear Colleague Letter came from a disputed 2007 study, which was based on an overly broad definition of sexual assault and which, according to the study authors, was not derived from a nationally representative sample.  Schow, "No, 1 in 5 Women Have Not Been Raped on College Campuses," *Washington Examiner*, August 13, 2014, http://www.washingtonexaminer.com/no-1-5-women-have-not-been-raped-on-college-campuses/articles/2551980.

15.     A Bureau of Justice Statistics (DOJ) study, 1995-2013, published in December 2014 found that college-age female students on campus were less likely to be victims of sexual assault than non-students and the real number of college women assault victims is .03 in 5; these statistics do not support the notion of a "crisis" of violence against *women*.  *Rape and Sexual Assault Victimization among College Age Females, 1995-2013* (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf.

16.     The April 2011 Dear Colleague Letter, in order to provide females what was unjustified preferential treatment, imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves.  The "April 2011 Dear Colleague Letter" (pp. 10-11) required schools to adopt a relatively low burden of proof -- the preponderance of the evidence ("more likely than not") -- in cases involving sexual misconduct, including sexual assault.

Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."  The April 2011 Dear Colleague Letter (p. 12) also strongly discouraged allowing cross-examination of complainants because it "may be traumatic or intimidating" to the alleged victim. The "April 2011 Dear Colleague Letter" stated (p. 12) that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the April 2011 Dear Colleague Letter was published, schools changed their sexual assault and sexual harassment policies and procedures.  Additionally, the "April 2011 Dear Colleague Letter" stated (pp. 15-16) that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

17.      On April 29, 2014, the OCR published a document signed by then Assistant Secretary of Education in charge of the OCR Catherine E. Lhamon ("Secretary Lhamon") and bearing the title "Questions and Answers  on  Title  IX  and Sexual Violence." (the "2014 Q&A"): http://www2.ed/gov./about/offices/ list/ocr/docs/qa-201404-title-ix.pdf.  The 2014 Q&A continued OCR's effort to restrict students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.  For example, OCR's 2014 Q&A states that schools: (i) "must not require a complainant to be present" at sexual misconduct disciplinary hearings" (p. 30); (ii) may decide to eliminate all opportunities for "cross-examination" (p. 31); and (iii) must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 38).

18.     Neither OCR's April 2014 Q&A nor the April 2011 Dear Colleague Letter were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the April 2011 Dear Colleague Letter constituted substantive decision-making.

19.     In a letter dated December 30, 2014, the OCR informed the Harvard Law School that the sexual misconduct policy it continued to use after issuance of the April 2011 Dear Colleague Letter "*improperly* used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, *in violation of Title IX*." (Emphasis in original.) The O C R  letter stated that the higher clear and convincing standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence and directed the Harvard Law School, by January 15, 2015, t o  a d o p t  procedures "that comply with the applicable Title IX regulations and OCR policy," which procedures must include "[a]n explicit statement that the preponderance of evidence standard will be used for investigating      allegations      of      sexual      harassment      or      violence." https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf.   Other schools, including State University of New York-Buffalo and Princeton University, were required by the OCR to use the preponderance of the evidence standard in adjudicating sexual misconduct cases.

20.     The April 2011 Dear Colleague Letter and April 2014 Q&A led colleges and universities to devise victim centered procedures for adjudicating sexual assault that are not neutral and impartial; and the reality is that males are almost always the "accused" respondents and females are almost always the "victim" complainants.  Almost all complainants are females and almost all respondents are males.  An United Educators study showed 99% of the accused are male. "Confronting Campus Sexual Assault: An Examination of Higher Education Claims," https://web.archive.org/web/201701225139/https://www.ue.org.uploaded

[8]

Files/Confronting%20Campus%20Sexual%20Assault.pdf.

21.     The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.  Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office for Civil Rights ("OCR"), delivered what was treated as marching orders by colleges and universities.

22.     In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

23.     In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."  Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter.  Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school.  Assistant Secretary Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

[9]

24.     In July 2014, then Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the April 2011 Dear Colleague Letter. "Do not think it's an empty threat," then Assistant Secretary Lhamon warned.  She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce."  Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

25.     Then Assistant Secretary Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

26.     To support making the "April 2011 Dear Colleague Letter" binding, the OCR hired hundreds of additional investigators for Title IX enforcement.  The Federal Government has investigated over 250 schools for possible Title IX violations, including notable schools.

27.     Colleges and universities, including Columbia, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ").  The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds a Title IX violation, the "school risks losing

federal funds," that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools and that if a voluntary resolution cannot be reached, the DOJ may initiate litigation.  In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," *Huffington Post*, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

28.     To revoke federal funds -- the ultimate penalty -- is a powerful tool because educational institutions receive billions of dollars a year from the federal government.  Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."  "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

29.     The DOE and OCR created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty:

College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

30.    Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

31.    In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, such as Columbia, limited procedural protections afforded to male students, such as John Doe, in sexual misconduct cases.

32.    On September 7, 2017, Department of Education Secretary Betsy DeVos denounced the campus sexual misconduct proceedings as denying due process in a manner that is wholly un-American: www.ed.gov/news/speeches/secre

tary-devos-prepared-remarks-title-ix-enforcement_enforcement.    A few weeks later, the September 22, 2017 Dear Colleague Letter, https://www.cmu.edu/title-ix/colleague-title-ix-201709.pdf, formally revoked the April 2011 Dear Colleague Letter and criticized it for directing that schools use sexual misconduct procedures with reduced protections for the accused, which have almost always been males.  Among other things, the September 22, 2017 Dear Colleague Letter called upon colleges and universities to use the higher standard of proof of clear and convincing evidence if the school uses that standard for their regular misconduct cases.

33.    Despite a different direction announced by the current White House Administration, colleges and universities have mostly continued with practices and policies in place created to comply with the April 2011 Dear Colleague Letter resulting in gender biased enforcement of Title IX.  Columbia is one such university.

**B.**    **August 2016-August 2017: John Doe and Jane Roe Become Friends.**

34.    In August 2016, John Doe enrolled as a Columbia graduate student.  At an orientation gathering in August 2016, John Doe met Jane Roe, and they became friends.

35.    At the time, John Doe was in his mid-twenties, and Jane Roe was two years older. John Doe and Jane Roe were in a few classes together, would frequently talk about the classes, send each other funny articles and pictures and went out together to have drinks at Columbia graduate school mixers.

36.    Jane Roe was from another country, was struggling with English and was homesick. As time progressed, John Doe became a supportive friend to Jane Roe.  For his birthday, John Doe invited only his close friends to a birthday party and Jane Roe was one of the invitees.  Throughout this time, the friendship between John Doe and Jane Roe remained platonic.

37.    During the summer of 2017, John Doe and Jane Roe were not in New York together. Jane Roe was in her home country, but John Doe and Jane Roe nevertheless communicated regularly over Facebook.

38.    In August 2017, John Doe returned to New York for another year of graduate school.  In mid-August 2017, Jane Roe also returned to New York for another year of graduate school.

**C.**    **The Night of Friday, August 25, 2017.**

39.    On Friday, August 25, 2017, John Doe was in his Manhattan apartment intending to spend the night at home.  At 8:01 pm, John Doe texted Jane Roe to find out whether she had returned to New York and ask what she was going to do that weekend.  Jane Roe responded by text that she and some friends were out socializing and invited John Doe to join them.  John Doe texted back to say he had planned to stay home and to invite Jane Roe and her friends to come

[13]

over to John Doe's apartment.  Jane Roe, after initially saying no, texted John Doe asking if he still wanted them to come to his apartment.  John Doe replied, "Yeah come."  About nine people, including Jane Roe, went to John Doe's apartment, arriving around 10:00 pm, and John Doe hosted his guests with food and drink.

40.     The gathering lasted for about an hour and as a result, not much alcohol was consumed by anyone and what alcohol was consumed was accompanied by food.  During the time at John Doe's apartment, John Doe talked with Jane Roe and her friend, a Columbia graduate student who hailed from the same country as Jane Roe and who presently became Jane Roe's roommate.   In one conversation, Jane Roe asked John Doe if he would be married soon to John Doe's girlfriend, and John Doe said "maybe."  Jane Roe's response was "Imagine if we were married."  John Doe "left it at that" and did not say anything.

41.     Soon after that conversation, Jane Roe and her future roommate convinced John Doe to accompany them to a housewarming party.  Jane Roe, John Doe and approximately eight other guests left John Doe's apartment without straightening up the party mess.  Jane Roe's future roommate confirmed that John Doe still "wanted to stay" home in his apartment, but he was persuaded to go out.

42.     John Doe, Jane Roe and her future roommate rode together in an Uber.  When the three arrived at what was thought to be the location of the housewarming party, they learned it was at a nearby address to which they walked.  John Doe, Jane Roe and her future roommate all walked to that location.   Jane Roe walked normally without difficulty and without any apparent impairment.

43.     John Doe and Jane Roe spent about a half hour at the housewarming party during which time John Doe talked with two guests from another country. When it came time to leave,

John Doe, while initially expressing a desire to go home, was persuaded to go to a dance club in Chelsea with a group of six people, including Jane Roe and her future roommate.

44.     The group arrived at a dance club in Chelsea, New York, at approximately 11:30 pm.  To enter the dance club, it was necessary to walk down a ramp, which Jane Roe did without any difficulty.

**D.     The Early Morning Hours Of Saturday, August 26, 2017.**

45.     When John Doe, Jane Roe and the others first arrived at the Chelsea dance club, John Doe purchased a drink and opened a tab at the bar.  At the dance club, John Doe socialized with several people, chatted with the bartender and danced in a group with others.  Sometimes, Jane Roe was involved in the dancing; sometimes, she was not.

46.     At approximately 12:30 am, John Doe and Jane Roe began talking and joking with one another, and their hands brushed against each other.  John Doe noticed and believed sexual energy might be building between them, but otherwise didn't think anything of it at the time. The two then went outside for a cigarette together, walking up the ramp without difficulty or assistance.

47.     After John Doe and Jane Roe returned to the dance club, they again separated for a period of time. At 1:12 am, Jane Roe sent John Doe a text searching for him.

48.     At about 1:15 am, Jane Roe's future roommate left the Club and went home.  After Jane Roe's future roommate left the dance club, Jane Roe found John Doe almost immediately. John Doe and Jane Roe found themselves standing face to face next to a couch near the bar and they began "mutual kissing" and "French kissing."  After kissing for some time, Jane Roe paused to ask about John Doe's girlfriend and said that John Doe responded that she was not here right now.

49.     Jane Roe and John Doe kissed some more until Jane Roe suggested a toast to the new school year. Jane Doe ordered two glasses of champagne at the bar on John Doe's tab, and John Doe and Jane Roe joined in a celebratory champagne toast.

50.     After the toast, John Doe and Jane Roe danced together on the dance floor in full public view. As later confirmed by numerous witnesses, Jane Roe danced in a sexually-charged manner with John Doe, grinding her body against John Doe, first with John Doe behind Jane Roe and then face-to-face.

51.     At approximately 2:15 am, one of Jane Roe's friends told Jane Roe that everyone was leaving the dance club and asked if Jane Roe wanted to go with them. Jane Roe told the witness that she wanted to stay at the dance club alone with John Doe.

52.     At approximately 2:20 am, alone together, John Doe asked Jane Roe whether she wanted to go back to John Doe's apartment. Jane Roe replied, "Yes."

53.     At approximately 2:30 am, John Doe and Jane Roe left the Chelsea dance club, walking up the ramp. Jane Roe walked up the ramp easily and without assistance. The two then took a cab and in the cab they resumed kissing, as they were doing in the dance club. Jane Roe put her hand over John Doe's pants on his penis, rubbing it, while John Doe digitally penetrated Jane Roe. This sexual activity was consensual, with Jane Roe responding with heavy breathing and kissing.

54.     At some point between 2:40 am and 2:50 am, John Doe and Jane Roe arrived by taxi at John Doe's apartment building. The two walked up two flights of stairs together to John Doe's apartment, and Jane Roe walked without assistance. Jane Roe was smiling and seemed relaxed.

55.     Once inside the apartment, Jane Roe kicked off her shoes and went with John Doe to the couch, where the two continued kissing.  Jane Roe explicitly consented to moving to John Doe's bedroom where the two lay down together on his bed and continued kissing.  There, Jane Roe touched John Doe's penis over his pants and then undid the belt on John Doe's pants.  Jane Roe did this on her own accord without any prompting from John Doe.

56.     At some point, John Doe suggested moving to the master bedroom, which was larger and had a larger bed.  Jane Roe verbally affirmed she wanted to move to that bedroom, and the two walked to the master bedroom.  On the way to the larger bedroom, John Doe again observed that Jane Roe did not have any difficulty walking.  John Doe took his clothes off. Jane Roe took off her underwear on her own accord.  John Doe requested that she keep her dress on, which she did.

57.     In the larger bedroom, John Doe and Jane Roe got into bed.  Jane Roe indicted that she was ready for sexual intercourse, and so with no physical force and without much additional foreplay, John Doe got on top of Jane Roe and the two engaged in sexual intercourse. Throughout the ensuing sexual intercourse, Jane Roe exhibited enjoyment and was moving her hips in rhythm with John Doe.  At one point, Jane Roe got on top of John Doe.  While engaged in sexual intercourse in this position, Jane Roe exhibited enjoyment and said to John Doe "you're so sexy." John Doe and Jane Roe then switched positions to John Doe having sexual intercourse from behind Jane Roe.  But then John Doe felt performance anxiety and lost his erection.

58.     John Doe and Jane Roe switched to performing oral sex mutually upon each other, which caused John Doe to become erect again.  The two resumed sexual intercourse in the missionary position and continued until John Doe asked Jane Roe if he could climax inside her, to

which she verbally responded "yes."  After the intercourse, John Doe and Jane Roe kissed and fell asleep lying side by side next to each other in bed.

**E.**     **The Next Day Saturday, August 26, 2017: John Doe.**

59.     At about 10:00 am on Saturday, August 26, 2017, John Doe woke up and noticed that Jane Roe was not there with him.  He also heard the porter of his building banging on the door and yelling that there had been a gas leak in John Doe's apartment.  The porter told John Doe that the porter and a resident had entered the apartment earlier that morning because the upstairs tenants reported the smell of leaking gas.  At that time, the porter and a resident discovered and closed a gas valve in John Doe's bedroom (the bedroom had been a kitchen before the apartment was redone) that had been jarred open and was leaking gas.  They did not go into the larger bedroom where John Doe and Jane Roe had been sleeping.  After dealing with this second visit by the porter, John Doe texted Jane Roe because he wanted to make sure it would not be awkward between them and they would remain friends.  Jane Roe did not respond.

60.     Later that same evening, John Doe again tried to reach Jane Roe, texting her "How u feeling today?  I have been tired all day lol."  But John Doe received no response. The next day, through Messenger, John Doe tried to send Jane Roe the message "Hey . . . Whatsup . . .How r u." But upon trying to send the message, John Doe discovered that Jane Roe had blocked him.  John Doe called his sister and asked for advice. John Doe told his sister that he had slept with a friend of his who had since blocked him on Messenger and asked why she would do that. John Doe's sister told John Doe that the woman probably feels ashamed and guilty about what happened.  John Doe concluded that Jane Roe's blocking him on Facebook meant she did not want to talk with him for now. John Doe respected Jane Roe's decision and made no further attempts at contact.

**F.**   **The Next Day Saturday, August 26, 2017: Jane Roe.**

61.   Sometime in the morning after the sexual encounter, Jane Roe woke up and found herself lying in bed next to John Doe.  Jane Roe decided to leave, but realized she needed first to find her underwear, her keys, her cell phone and her new shoes.  Jane Roe quietly left the bedroom and looked for her missing items, which she found in various places in the apartment where she left them – her shoes where she kicked them off; her cell phone in the couch cushions where she initially sat down; her backpack in John Doe's bedroom where she brought it before moving to the master bedroom; and her keys and wallet in her backpack where she put them.  Jane Roe, after retrieving her belongings, left the apartment and walked to her apartment, which was seven blocks away from John Doe's apartment.

62.   On her way home the next morning, after sleeping a few hours with John Doe, Jane Roe noticed that a fellow Columbia student, with whom she had been intimate for the first time the immediately preceding night and who later became her boyfriend, had responded at 8:08 am Saturday morning to Jane Roe's text to him very early Saturday morning at 12:53 am.

63.   Jane Roe had, beginning at 8:23 pm on the prior Friday night, sent a series of texts to the future boyfriend, referring to their previous night romantic encounter, asking whether he regretted the encounter and admitting being "paranoid and insecure" about "intimate connections." Jane Roe's future boyfriend had responded in a text at 12:20 am, but then did not communicate further with Jane Roe until his 8:08 am Saturday morning text.

64.   The text that Jane Roe had sent her future boyfriend at 12:53 am early Saturday morning asked if she could come over to his apartment.  Beginning about 1:15 am, Jane Roe sent location updates to her future boyfriend.  At 2:13 am, Jane Roe sent a three-word text in her native language again inviting herself over to her future boyfriend's apartment.  Throughout the evening,

[19]

Jane Roe also made a series of 16 or 17 telephone and Facetime calls in unsuccessful efforts to reach her future boyfriend.  Finally, at 8:08 am Saturday morning and in response to Jane Roe's 12:53 am text, Jane Roe's future boyfriend texted: "Hahahaha. Thanks for those location updates."

65.     Jane Roe responded at 10:33 am by texting her future boyfriend, including two different types of smiling, happy emojis in her texts. One of these emojis was a simple smiling face, and the other was a smiling, happy face with a little suggestive sweat droplet on its brow.  At the same time, Jane Roe sent a second text to her future boyfriend apologizing for all of her prior night texts/pin drops/Facetime calls.

66.     After not getting a response to her 10:33 am text, then, 20 minutes later at 10:53 a.m., Jane Roe sent two additional texts to her future boyfriend stating: "You wanna hang out today?" and "I really want to see you."  Jane Roe later testified to the Columbia investigation team that she originally intended to simply "just go into [her] bed" and then hopefully see the future boyfriend later that same day.  Jane Roe's texts from 10:33 am to 10:53 am and her later stated intentions are completely consistent with Jane Roe spending a night out dancing with John Doe and others, engaging in consensual sexual intercourse with John Doe until after 3:00 am, having only a few of hours of sleep and then, after resting/napping in her room, hoping to hang out later that same day with the person with whom she was intimate the immediately preceding night.

67.     Jane Roe told the Columbia investigation team that while walking home, she had decided to go into her room and "not talk about what occurred the previous night." Thus, after entering her home with her shoes in her hands (because of the "crazy" blisters on her feet), disheveled hair, little sleep and showing discomfort from walking multiple Manhattan blocks with blistered feet, Jane Roe sat with her cousin for a few moments and, according to her cousin, said nothing about the prior evening. Jane Roe then went alone into her room ready to rest/take a nap.

[20]

68.     At 11:02 am, Jane Roe finally received a response text from the future boyfriend rejecting her attempt to get together that day because he was going to Central Park for another woman's birthday. One minute later, Jane Roe called her future boyfriend. This was just 10 minutes after her casual, breezy text asking him if he wanted to hang out later that same day. The future boyfriend later told the Columbia investigation team that Jane Roe was upset and crying hysterically on the phone and that she said she was going to the hospital with her cousin, but she did not tell him why and he did not press the point.

69.     Around noon, Jane Roe agreed with her cousin to go to the hospital and did.   At the hospital, Jane Roe wanted her cousin to do most of the talking.   There, Jane Roe received medical care, including a sexual assault forensic examination.   The hospital nurse recorded that Jane Roe was on Prozac and that Jane Roe admitted to a history of "loss of inhibitions."  Jane Roe then went back to her apartment where she deleted everything as to John Doe and blocked him on Facebook.

70.     Later that same day, Jane Roe's future roommate, who had accompanied Jane Roe the previous evening, sent a Facebook message to John Doe, asking him if he had heard from Jane Roe and saying she was trying to reach Jane Roe but that Jane Roe's phone was off and she was not replying on Messenger.   The future roommate later wrote John Doe, "No worries she's at home."

**G.      August 27-31, 2017: Jane Roe and John Doe.**

71.     On Sunday afternoon, August 27, 2017, Jane Roe and her cousin met at the cousin's apartment with Jane Roe's future roommate. Jane Roe would later claim that she had "blackout memory loss" and remembered little of what happened the prior evening.  Consequently, the three

women spent the afternoon recreating the events of Friday night and Saturday morning and began developing what eventually became Jane Roe's narrative in her Title IX complaint.

72.     On Monday evening, August 28, 2017, Jane Roe got together with her future boyfriend and discussed the incident.  According to the future boyfriend's testimony, Jane Roe told him that at the time "she didn't think there was any problem in going back to John Doe's place because [we] are so close and are friends."

73.     A few days later, John Doe saw Jane Roe on the Columbia campus. John Doe was talking with a friend.  John Doe did not approach Jane Roe and did not have any face-to-face interaction with her that day or any day thereafter.  John Doe believed that Jane Roe felt guilty or embarrassed about their sexual encounter, and he did not want to press the issue with her.

**H.     September 17, 2017-March 2018: Incident Report, Investigation, Draft Investigation Report.**

74.     On September 17, 2017, Jane Roe made a sexual misconduct complaint (Incident Report) to Columbia concerning the night of August 25, 2017 and early morning hours of August 26, 2017, accusing John Doe of nonconsensual sexual assault.

75.     Based on Jane Roe's reconstruction of events with her cousin, her future roommate and her future boyfriend, Jane Roe claimed to have a different "memory" of the events at the Chelsea dance club than did John Doe.  In the Incident Report, Jane Roe reported that, shortly after her future roommate left the Club at 1:15 am, John Doe started being "inappropriate" with her. According to Jane Roe's Incident Report, after her future roommate left the Chelsea dance club, John Doe "tried to kiss" her and "stroked his crotch against [her] thigh."  Jane Roe claimed that she laughed it off, but otherwise voiced her displeasure.  Jane Roe also claimed in her Incident Report (and later in her statements to the Columbia investigation team) that after her future roommate left

the Chelsea dance club, John Doe's "presence was scaring" her and "What I remember most clearly is a strong feeling of fear and powerlessness."

76.     Thus, Jane Roe made two fundamental claims: *first*, that all sexual activities at the Chelsea dance club were one-sided, uninvited and unwanted; and *second*, that there was an atmosphere of fear beginning in the Chelsea dance club at around 1:15 am.  As will be discussed below, each of these fundamental tenets of Jane Roe's narrative is inconsistent with the evidence.

77.     By letter dated September 20, 2017, John Doe was notified of the commencement of the Columbia investigation of Jane Roe's report of sexual assault. The investigation would be conducted by Columbia Title IX Investigators Benjamin Marzolf and Jennifer Kelly.

78.     The investigation began with an interview of Jane Roe on October 5, 2017, and John Doe on October 11, 2017.  The initial phase of the investigation continued through the interviews of eleven other witnesses from October 12, 2017 through November 21, 2017.  During that period, documents were obtained by the investigators.  (A twelfth witness was interviewed on March 27, 2018 after the draft Columbia investigation team report was furnished to John Doe and Jane Roe.)

79.     On or about December 27, 2017, the investigators provided John Doe and Jane Roe with a copy of the draft Columbia investigation team report.  The draft report consisted of fifty-three pages of text and several hundred pages of exhibits.  The substantive text (forty-four pages) recounted the Columbia investigation team's interviews with John Doe, Jane Roe and the ten witnesses offered by Jane Roe and the one witness (his sister) offered by John Doe, without any analysis of the overt, fundamental inconsistencies and discrepancies contained in the report.

80.     Jane Roe's witnesses consisted of her cousin and then roommate, her future roommate, her future boyfriend, three eyewitnesses who accompanied the group to the Chelsea

dance club, one additional witness who was at the Chelsea dance club (who had very little to say) and three after-the-fact witnesses, each of whom stated they were among Jane Roe's best friends. John Doe's only witness at this point was his older sister whom he had called for advice when Jane Roe had unfriended him on Facebook. John Doe had never before met anyone who was present during the night of August 25 and early morning of August 26, and so he had no additional eyewitnesses to the events. Notably, Jane Roe's three eyewitnesses who were the only persons who witnessed the evening's events at the Chelsea dance club, *supported John Doe's narrative of what happened at the Chelsea dance club and disputed Jane Roe's narrative.*

81.     Upon receiving the draft Columbia investigation report, John Doe realized and raised with the Columbia investigators that the incident with Jane Roe raised two medically-related issues. The first issue concerned the nature of, and cause for, Jane Roe's bruising that she reported to the investigators. The second issue concerned the ramifications of Jane Roe's self-reported "blackout memory loss." After five weeks of foot-dragging by the Columbia investigation team, John Doe received permission to, and ultimately did, submit expert reports on these issues from two well-regarded and distinguished medical experts.

82.     John Doe's bruising expert confirmed that in terms of timing, size, shapes, locations, colors and causation, Jane Roe's bruising was not indicative of a sexual assault. John Doe's memory expert raised serious questions about the credibility of Jane Roe's reconstructed memory.

83.     Despite the impressive credentials of John Doe's experts and their carefully considered expert reports, the Columbia investigation team concluded that the expert reports were not reliable because the experts were paid for by John Doe. At John Doe's insistence, the expert

reports were grudgingly included in the record for the Columbia hearing panel's consideration, but the Columbia investigation team dismissed their significance.

84.     On March 13, 2018, John Doe submitted a response to the draft Columbia investigation team report, raising questions about the many overt fundamental inconsistencies and discrepancies between Jane Roe's narrative and the evidence in the record.  As described in more detail below, the Columbia investigation team chastised John Doe for submitting such a response and effectively said it would not be considered.

85.     The Columbia investigation team gave John Doe the opportunity to submit written questions to be asked of Jane Roe at the upcoming pre-determination conference. In addition to all the matters John Doe highlighted in his March 13, 2018 response, John Doe submitted five additional questions for Jane Roe in an effort to establish facts showing consensual sexual activity by Jane Roe with John Doe. John Doe assumed that a fair and impartial investigation team would follow up on the questions raised in his response.

86.     The Columbia investigation team never asked Jane Roe about the many matters John Doe raised in his March 13, 2018 report and it was not included in the record provided to the Columbia hearing panel or the Columbia appellate panel.

**I.**     **March 20, 2018:  Pre-Determination Conference.**

87.     Columbia's disciplinary procedures provide for a conference to be held by the investigators with the parties before a decision is made in the case.  On March 20, 2018, the Columbia investigation team held a pre-determination conference with John Doe.

88.     John Doe was surprised that, during the conference, the Columbia investigation team pressed hard on John Doe's assertion that he and Jane Roe had spent the night in the larger bedroom rather than in his much smaller bedroom. At the time, John Doe did not understand why this detail was important. But this seemingly minor detail ultimately became a major factor that both the Columbia investigation team and later the Columbia hearing panel relied on in questioning John Doe's credibility. The record is quite clear that John Doe and Jane Roe in fact spent the night in the larger bedroom.  Had John Doe and Jane Roe spent the night in John Doe's bedroom, as Jane Roe contended, the building porter would have come across John Doe and Jane Roe when the building porter was investigating the gas leak in the apartment.  The building porter did not come across John Doe and Jane Roe in John Doe's smaller bedroom.

**J.**     **April 12, 2018-April 17, 2018:  Final Investigation Report;**
**John Doe's Written Response To The Charges.**

89.     Late Thursday evening, April 12, 2018, the Columbia investigation team provided John Doe and Jane Roe with the final Columbia investigation team report.  The final Columbia investigation team report was in part the same as the draft investigation report in terms of the party and witness interview summaries, but was expanded with the addition of another twenty-seven pages of "Findings and Analysis."  The Columbia investigation team found, based on the preponderance of the evidence, that John Doe had vaginal intercourse with Jane Roe and that Jane Roe was not incapacitated. The Columbia investigation team report then asserted (erroneously) that

[26]

Jane Roe did not provide affirmative consent to sexual intercourse and that John Doe used physical force to engage in sexual intercourse.

90.     The first part of the "Findings and Analysis" in the final Columbia investigation team report consisted of stringing together party-by-party and witness-by-witness interview summaries and credibility assessments with few citations to the record.  In that part, there was no summary analysis providing a clear picture of each party's narrative and no synthesis of each party's multiple interviews, and there was no reconciliation of the testimony of all the witnesses and evidence and no analysis of inconsistencies in the party and witness statements and documents.

91.     The investigation team report's stringing together party-by-party and witness-by-witness interview summaries and credibility assessments obscured the fact that the Columbia investigation team had simply accepted Jane Roe's narrative uncritically without asking proper follow up questions about either (a) Jane Roe's credibility issues or (b) inconsistencies raised by the statements of Jane Roe's eyewitnesses and the documentary evidence she had submitted.

92.     John Doe was given until only Tuesday, April 17, 2018 to provide his written response.  This was a mere three working days to respond to a ninety plus page single-spaced report having several hundred pages of exhibits.  Further, John Doe's response was limited to only ten single-spaced pages.

93.     The time table and page limitation underscore Columbia's lack of interest in receiving a meaningful response.  The Columbia investigation team took *seven months* to prepare a 90+-page report (with hundreds of pages of exhibits), but limited John Doe to respond in three working days in ten pages.  That is not a fair and impartial truth-seeking process.

94.     Still, John Doe met the deadline and on Tuesday, April 17, 2018, John Doe submitted a written response to the final Columbia investigation team report stating he had been

wrongly and falsely accused.  The page limitation, however, made it impossible for John Doe to pull all of the witness statements together in a concise summary and to point out the many errors in the investigation report.

**K.**   **April 18, 2018-April 24, 2018:  The Hearing and Hearing Decision.**

95.    On April 18, 2018, the Columbia hearing panel received the complete record consisting of the final Columbia investigation team report and party response statements.   On April 19, 2018, the Columbia hearing panel held a "hearing."  By letter dated April 20, 2018, the Columbia hearing panel announced its finding that John Doe was responsible for sexual assault involving two instances of non-consensual sexual intercourse.

96.    The April 20, 2018 Columbia hearing panel decision was issued only two days after the Columbia hearing panel received the complete voluminous written record and only one day after the hearing.  The Columbia hearing panel simply adopted the Columbia investigation team findings, including as to the point that John Doe lacked credibility because he contended that he and Jane Roe spent the night in the master bedroom and not his smaller bedroom. The Columbia hearing panel ignored, as had the Columbia investigation team, that there was a gas leak in John Doe's bedroom that night and the building porter would have -- but did not -- come across John Doe and Jane Roe in that bedroom if that had been where John Doe and Jane Roe were.

**L.**   **April 24, 2018: The Sanction: Expulsion.**

97.    Only four days later, on Tuesday, April 24, 2018, Jeri Henry, Columbia's Vice President of Student Conduct and Community Standards, sent John Doe a sanction letter issued from the Dean for the Columbia graduate school which John Doe was attending.

98.     The sanction letter stated that the Dean had reviewed the entire file and had concluded that in light of the serious nature of the violations, John Doe should be expelled from the Columbia graduate school program.

99.     The sanction letter further stated that John Doe's transcript would reflect the notation of "*Disciplinary Expulsion*," that expulsion was a permanent separation from Columbia rendering him ineligible to return to Columbia at any time and that he was not permitted to be on Columbia's campus at any time for any reason.

## M.     May 1, 2018 - May 14, 2018: The Appeal.

100.    Under Columbia procedures, John Doe was entitled to seek a review of the Columbia hearing panel disciplinary decision and the sanction only on the grounds of (i) procedural error, (ii) new information that would alter the decision and/or (iii) excessive sanction.

101.    On May 1, 2018, John Doe submitted his appeal. John Doe's appeal stated that he had engaged in consensual sexual intercourse with Jane Roe. John Doe also argued that the sanction was excessive and should be reduced to a suspension.  John Doe noted that he had an unblemished record at his undergraduate college and elsewhere and that he had provided the names of five faculty members to serve as character references.

102.    The Columbia appellate panel summarily denied the appeal by letter dated May 14, 2018, leaving in place the responsibility decision and expulsion sanction.  The Columbia appellate panel stated that the Columbia hearing panel decision can be changed only if there is a procedural error or new information, and that John Doe was asking for a *de novo* review of the substantive issues of fact, which was stated not to be grounds for an appeal as recognized by Columbia.  The Columbia appellate panel went on to cite some of the facts but in doing so simply repeated the Columbia investigation team's misstatements.

103.     The Columbia investigation team had accepted Jane Roe's narrative uncritically and conducted a palpably inadequate investigation.  The Columbia hearing panel was pressed by time and rubber-stamped the Columbia investigation team report; as a consequence, John Doe never received a fair and impartial hearing.  The Columbia appellate panel rubber-stamped the Columbia hearing panel decision because it considered itself bound by the Columbia hearing panel's conclusion on the substantive issues of fact.

104.     At the time of the expulsion, John Doe was about one month short of graduating and receiving a Columbia graduate diploma.  The terms of the expulsion meant that John Doe was deprived of his Columbia graduate degree and thus the benefit of the two years of work and tuition that he had put into the program.

### FIRST CAUSE OF ACTION:
### (Violation of Title IX of the Education Amendments of 1972)

105.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**A.     Title IX and Its Application.**

106.     Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

107.     Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

108.     In its fiscal year ending June 30, 2017, Columbia received nearly $645,000,000 in federal funding for research and development.

109.     Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

110.     Challenges to university disciplinary proceedings for sex discrimination generally fall in two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "undue severity of penalty/selective initiation" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.  *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).

111.     An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault and the totality of the circumstances establish gender bias was a motivating factor.   An "undue severity of penalty" occurred in this case because John Doe, who had no prior disciplinary history and who believed he had consent for the non-intercourse sexual conduct that occurred, was expelled from Columbia and this "unduly severe penalty" was affected by John Doe's male gender.

**B.     John Doe Has Been Wrongly Found Responsible
         In A Gender-Biased Process: The Evidence.**

   **(i)     John Doe's memories are clear; Jane Roe claims that she had a "black-out" memory loss and therefore had to recreate her memories with the help of friends who were not with her at any relevant time.**

112.     John Doe has a clear recollection of the events that took place on August 25, 2017 and August 26, 2017, and provided the Columbia investigation team with a comprehensive and coherent account that is consistent with the other evidence in the investigation record.  The sexual

intercourse between John Doe and Jane Roe on August 26, 2017 was the result of a knowing, voluntary and mutual decision to engage in sexual intercourse, Jane Roe had the capacity to make a reasonable, rational decision because she had the ability to understand her decision, and no force, no intimidating behavior and no coercion was involved.

113.    Jane Roe, on the other hand, had virtually no recollection of the evening's events because she claims to have had "blackout memory loss." Jane Roe admitted that she had therefore recreated the events of the early morning with the help of three friends who were not present at any relevant time.  Jane Roe conceded that toward the end of the night her "memory becomes …blackout with the glimpses of memory" and that her memory became "weird."  She had no recollection of important details and, with respect to one "memory" the Columbia investigation team found significant, she conceded, "I don't even know if that's a real memory anymore."

114.    As will be described herein, Jane Roe's reconstructed narrative is based on two principal claims -- (i) that Jane Roe engaged in no mutual sexualized activity with John Doe at the Chelsea dance club and (ii) that Jane Roe's "clearest memory" of the evening was that she was afraid of John Doe before entering his apartment.  Jane Roe tries to support her "fear narrative" by also claiming that she was afraid when she woke up in John Doe's apartment early the next morning. As will be shown in detail herein, the documentary evidence, testimony of all the eyewitnesses, and Jane Roe's course of conduct contradicts Jane Roe's narrative and clearly establishes that both of Jane Roe's principal claims are false.  Accordingly, Jane Roe's testimony lacks credibility.

    **(ii)**    **The evidence showed that Jane Roe and John Doe engaged in consensual sexual activities at the Chelsea dance club; Jane Roe's claim that she engaged in no consensual sexualized activity with John Doe at the club was false.**

115.    Jane Roe contended, as one fundamental pillar of her Incident Report and in her narrative to the Columbia investigation team, that there were no consensual sexual activities between her and John Doe at the Chelsea dance club.  John Doe's memories are to the contrary, and the investigation record backs him up.

116.    Jane Roe's Incident Report states, in relevant part:

> "Between 1 and 1:30 am my roommate decided to leave the club. At this point I did not feel anything more than lightly drunk, I am not the kind of person that tends to blackout but this night I did…. When my roommate left I only remember having one glass of sparkling wine and my attacker suddenly becoming inappropriate with me. He tried to kiss me at the bar and stroked his crotch against my thigh. I laughed it off and said "hey, no, what are you doing? We are friends and you are engaged. What about [John Doe's girlfriend]?" For the entire year of us knowing each other I had always assumed he was in a committed relationship and therefore it had never crossed my mind that something like this might happen."

117.    Notwithstanding this statement, the testimony of Jane Roe's three eyewitnesses (using the Columbia investigation team's nomenclature of Witness #5, Witness #6 and Witness #8) unequivocally contradicted Jane Roe's narrative and, together, their testimony establish that Jane Roe freely and voluntarily kissed and engaged in sexualized dancing with John Doe at the Chelsea dance club for an extended period of time (i.e., over one hour), and appeared to enjoy what she was doing.

118.    John Doe told the Columbia investigation team that, despite the fact that he was at the Chelsea dance club with no friends of his own and despite the crowded conditions on the dance floor, he assumed others who accompanied Jane Roe to the Chelsea dance club observed Jane Roe kissing him and engaging in other mutual sexualized activities, but he had no way of knowing for sure.

119.     Indeed, *each* of Jane Roe's three eyewitnesses who were still at the Club after 1:15 am gave statements entirely consistent with John Doe's testimony about the mutual sexualized activities between John Doe and Jane Roe at the Chelsea dance club.  These eyewitness statements flatly contradict Jane Roe's narrative that the sexual activities at the Chelsea dance club were one-sided, uninvited and unwanted.  Together, these three eyewitnesses (Witness #5, Witness #6 and Witness #8) observed Jane Roe and John Doe mutually and consensually kissing, hugging and/or touching, and Jane Roe voluntarily grinding sexually against John Doe on the dance floor:

(i)     Witness #8 confirmed that he observed Jane Roe and John Doe kissing, didn't see Jane Roe disagreeing with what was happening, didn't see Jane Roe trying to reject John Doe and didn't see Jane Roe moving her head when John Doe was trying to kiss her;

(ii)    Witness #6 denied observing Jane Roe looking uncomfortable with the dancing that he witnessed;

(iii)   Witness #5 believed that towards the end of the night Jane Roe looked like she was having "a really fun time" with John Doe; and

(iv)    Witness #5 and Witness #6 observed Jane Roe towards the end of the night and thought she looked "romantically involved" and "romantically or sexually interested" in John Doe and observed seeing "sexual tension" between Jane Roe and John Doe.

120.     John Doe had never met these witnesses before, and each of these witnesses already knew about Jane Roe's abhorrent allegations when they spoke to the Columbia investigation team.  Yet, each still supported John Doe's narrative, refuted Jane Roe's narrative, and testified to seeing Jane Roe engage in consensual sexualized activities with John Doe at the Club.

[34]

121.   Accordingly, the first fundamental tenet of Jane Roe's narrative -- no consensual sexualized activity at the Chelsea dance club -- was false.

**(iii)   The evidence showed that Jane Roe was not afraid of John Doe prior to entering John Doe's apartment; Jane Roe's claimed "clearest memory" of the evening, the "fear of John Doe" narrative, was false.**

122.   Jane Roe contended, as the second fundamental pillar of her Incident Report and in her narrative to the Columbia investigation team, that she became afraid of John Doe shortly after her future roommate left the Chelsea dance club at around 1:15 am.  This "fear of John Doe" narrative is contradicted by the preponderance of the evidence and is clearly false.

123.   Jane Roe told the Columbia investigation team that her "clearest memory" of the evening was a "strong feeling of fear," but it is clear that this "fear of John Doe" narrative was not part of Jane Roe's original story and was created several days later:

(i)   in their statements to the Columbia investigation team, neither Jane Roe nor her cousin mentions Jane Roe's "fear" when recalling their conversations in their apartment on Saturday morning;

(ii)   neither Jane Roe nor her cousin testified that they mentioned Jane Roe's "fear" to the hospital nurse and the hospital nurse's written report does not mention anything about "fear"; and

(iii)   in their statements to the Columbia investigation team, neither Jane Roe, her cousin nor her future roommate mention Jane Roe's "fear" when recalling their discussions on Sunday.

124.   Instead, the record is clear that Jane Roe's "fear narrative" was not created until she was alone with her future boyfriend, on Monday night, August 28. According to Jane Roe's future boyfriend, he looked at her texts/calls to him and "suddenly" *he* decided they had significance.

[35]

125.    By the time Jane Roe filed her Incident Report three weeks later on September 17, 2017, this "fear of John Doe" narrative was central to her story.  In her Incident Report, Jane Roe states:

> *What I remember most clearly is a strong feeling of fear and powerlessness. It can also be seen by the fact that I called a friend that I trust completely around 17 times that night, sent him updates of my location and a voice recording from my phone where my attacker's voice can be heard. That is not something I would do unless I felt less than safe.*

126.    The Columbia investigation team simply accepted Jane Roe's story without any critical analysis, ignoring the compelling evidence to the contrary such as the prior occasions Jane Roe called/texted the future boyfriend.

127.    The only plausible explanation for the Columbia investigation team's failure to question Jane Roe about her "fear of John Doe" narrative is that the Columbia investigation team presumed that Jane Roe was telling the truth (the Columbia investigation team report said as much) and had already made up its mind that John Doe was going to be found responsible. To any fair-minded observer, the Columbia investigation team's lack of analysis of Jane Roe's "fear of John Doe" narrative points to the result-oriented nature of their investigation.

128.    Far from demonstrating that Jane Roe was afraid of John Doe, the record of Jane Roe's "17" texts/calls to her future boyfriend unequivocally indicated that most of the 17 texts/calls explicitly show that (i) Jane Roe and her future boyfriend had been sexually intimate for the first time the preceding night, as was discussed in the texts, (ii) Jane Roe was upset her future boyfriend did not follow-up the next day and (iii) Jane Roe wanted to get her future boyfriend to invite her to his apartment during the early hours of Saturday morning. Indeed, Jane Roe did not mention her "fear" a single time in these texts, not even at 2:13 am when she texted him "Can I come over?"  Instead, the text record showed that Jane Roe attempted to contact her

future boyfriend not because she was afraid of John Doe, but rather because she would have preferred to be with her future boyfriend again.

129.    The text log indicated that Jane Roe was in constant contact with the future boyfriend throughout the night until 12:20 am when the future boyfriend sent his last text before he fell asleep. However, Jane Roe could not have known at that time that this would be the future boyfriend's last text of the night. Thus, Jane Roe continued to pursue the future boyfriend for almost two hours after his last text, finally culminating with a direct question at 2:13 am inviting herself over to his apartment. Shortly after texting the future boyfriend one last time, but not hearing back from him, Jane Roe agreed to accompany John Doe back to John Doe's apartment.

130.    The future boyfriend told the Columbia investigation team that Jane Roe had made similar numerous late night texts/calls to him after a different night out when she was not fearful or in trouble and that Jane Roe was later embarrassed by her conduct and apologized to him (as she does again here in her texts the next morning) for the numerous "drunk-dials." Thus, despite Jane Roe's claim in her Incident Report "that is not something I would do unless I felt less than safe," it is clear that this is in fact something she would do when she felt safe and that on August 26, 2017, Jane Roe simply repeated her prior course of conduct.

131.    Jane Roe's "fear of John Doe" narrative is also inconsistent with the fact that Jane Roe never expressed any concern for her safety – not once - in any one of the numerous texts and voicemails she sent (and could have sent) to multiple people during the entire morning.

132.    Furthermore, Jane Roe's "fear of John Doe" narrative is inconsistent with her explicit words and actions, including the following:

(i)     Jane Roe made no mention of her "fear" at 1:15 am when her future roommate left the Chelsea dance club;

(ii)     Jane Roe made no mention of her "fear" at 1:27 am when Jane Roe sent a text message to her future roommate;

(iii)     Jane Roe expressly told one of the eyewitnesses at around 2:15 am that she wanted to remain alone with John Doe at the Chelsea dance club even though everyone else she came with either left or was leaving;

(iv)     Jane Roe engaged in publicly-observed sexual activity with John Roe (kissing, touching, hugging, and grinding on the dance floor) way past 1:15 am when she claims that her "fear" began;

(v)     Witness #5, Witness #6 and Witness #8 did not believe Jane Roe was afraid of John Doe and believed they grew demonstrably closer as the night wore on;

(vi)     Jane Roe did not attempt to reach her cousin or anyone else after it became clear that her future boyfriend was not responding to her texts;

(vii)     At about 2:30 am, Jane Roe voluntarily agreed to accompany John Doe to his apartment by taxi;

(viii)     During the taxi ride, John Doe and Jane Roe continued to engage in mutual sexual activity; and

(ix)     Jane Roe never asked John Doe to drop her off at her nearby apartment (only seven blocks away) where her cousin was physically present at the time.

133.     The Columbia investigation team findings also left unanswered why Jane Roe did not simply tell the taxi driver to drop her off at her apartment a mere seven blocks away from John Doe's apartment if she was so afraid of John Doe. Surely, Jane Roe would have asked the driver to drop her at her nearby home if she was afraid of being alone with John Doe.

134.     Silence did not equal fear in this case, particularly since Jane Roe was sending texts throughout the night. Indeed, Jane Roe herself contradicted her "fear" narrative.  According to the testimony of the future boyfriend, Jane Roe told him that at the time "she didn't think there was any problem in going back to John Doe's place because [we] live so close and are friends."

135.     Jane Roe claimed that the text she sent to the future boyfriend at 2:13 am inviting herself over was in her native language because of the "John Doe fear" factor. That was not true given that two minutes later, she told one of the witnesses that she wanted to stay alone at the Chelsea dance club with John Doe.  Moreover, there is a much simpler explanation for the text language: the text was sent less than an hour after Jane Roe sent a text to her future roommate in their native language at 1:24 am.  Thus, the more likely explanation for the text is Jane Roe simply failed to reset her iPhone to English.

136.     Jane Roe also claimed that she consciously sent her future boyfriend a recording of John Doe's voice at 2:44 am as a precaution while she and John Doe were riding in the taxi. Jane Roe's future boyfriend undercut Jane Roe's narrative when he told the Columbia investigation team that they both actually later "surmised" that this call was "essentially a butt dial."

137.     As noted, Jane Roe asserted that her "fear" started at about 1:15 am and that she was entirely *conscious* of this fear, but despite texting/calling her future boyfriend numerous times throughout the night and despite being in contact with others throughout the night, Jane Roe never left a Facetime audio message or a text expressing her "fear" to anyone, not one single time. Further, Jane Roe claimed to have consciously made "17" calls, updates of her locations and Facetimes message out of "fear," but then failed to ask the taxi driver to take her home and instead agreed to accompany John Doe back to his apartment.

138.     When the Columbia investigation team sought to clarify why, if she was so scared of John Doe, Jane Roe chose to ride in a cab with John Doe, Jane Roe immediately changed her story.  In an attempt to align her claims with her actual conduct, Jane Roe asserted she was only "really scared" of the situation, but was not scared of John Doe -- even though the "situation" was limited to being alone with John Doe in a taxi heading to John Doe's apartment.  By shifting her "fear" from John Doe to "the situation," it was still illogical for her to go home with John Doe instead of being dropped off at her home where her cousin was physically present at that time.  Yet, the Columbia investigation team did not find it necessary to question Jane Roe further on this point.

139.     Later in the Columbia investigation process, Jane Roe made a different claim: that she felt "safer with John Doe" than going home to her apartment where her cousin was physically present.  The Columbia investigation team was unjustified in ignoring in their findings this explanation of why she accompanied John Doe in the taxi and went into his apartment even though she "feared" him.

140.     The Columbia investigation team was unjustified in accepting Jane Roe's assertion that her 17 texts/calls reflected a dramatic outreach attempt to a trusted friend because she was fearful that John Doe would later become a sexual predator, when those 17 texts/calls tell a different story.  The Columbia investigation team was unjustified in accepting Jane Roe's narrative that she became afraid of John Doe at around 1:15 am, even though she stated that she felt comfortable going back to John Doe's apartment. The Columbia investigation team was wedded to Jane Roe's narrative and did not pursue any angle that suggested or implied that they did not believe her story

141. Jane Roe's "fear of John Doe" narrative, which was created days later with the help of Jane Roe's friends, cousin and future boyfriend, was simply not true.

142. Accordingly, both fundamental tenets of Jane Roe's Incident Report and narrative, which were embraced as true and relied upon by the Columbia investigation team – no consensual sexual activity at the Chelsea dance club and "fear of John Doe" -- were demonstrably false. That covers almost all of what Jane Roe said she remembers about the evening's events.

**(iv)     John Doe and Jane Roe agreed they engaged in multiple sexual activities in multiple rooms in multiple beds in John Doe's apartment; these sexual activities were shown by the evidence to have been mutually consensual.**

143. John Doe (in his mid-twenties) and Jane Roe (two years older) voluntarily and mutually agreed to go back to John Doe's apartment at about 2:30 am in the morning after kissing, hugging, dancing, sexually grinding and staying exclusively together at the Chelsea dance club for about 1.25 hours after 1:15 am.  According to John Doe, Jane Roe and John Doe accelerated their sexual activities in the privacy of the back seat of the taxi. Jane Roe did not deny this; instead, she only stated that she didn't "recall" kissing or other sexual activities occurring in the taxi, not that none occurred.  John Doe's recollection of the taxi ride is consistent with the observed sexual behavior of John Doe and Jane Roe in the public confines of the Chelsea dance club.

144. Jane Roe voluntarily got out of the taxi when it arrived at John Doe's apartment and climbed two flights of stairs to get into John Doe's apartment.  Once in John Doe's apartment and after kicking off their shoes, Jane Roe and John Doe moved to the couch and began kissing. Then, they moved to John Doe's bedroom continuing sexual foreplay in his small bed. When John Doe asked if Jane Roe wanted to move to the master bedroom where the bed was larger, Jane Roe immediately agreed.  The larger bed was more conducive to comfortable sexual intercourse. After switching beds, Jane Roe and John Doe engaged in vaginal intercourse, first with John Doe on top

and then with Jane Roe rolling on top. They then switched positions again and had sexual intercourse from behind with Jane Roe up on all-fours. After John Doe experienced erectile dysfunction, they engaged in mutual oral sex, and eventually resumed intercourse in the missionary position. John Doe asked Jane Roe if she was on birth control and she said yes before John Doe ejaculated.  Jane Roe was an enthusiastic consensual partner.  Jane Roe and John Doe then fell asleep in the master bedroom.

145.    Jane Roe alleged in her Incident Report that due to her "blackout memory loss," her memory became "less clear" once she arrived at John Doe's apartment.  Specifically, due to her "blackout memory loss," she had only three memories.  These memories were somewhat consistent with John Doe's memories. They both remember being together in two separate beds in two separate rooms and having sexual intercourse in at least two different positions.

146.    Jane Roe's first claimed memory, according to the Columbia investigation team report and Jane Roe's Incident Report, was being in the master bedroom with its tall bedposts and having her dress on but no underwear. She then "thought" John Doe "pushed [her] on the bed and [she] got up on all fours…[and John Doe] flip[ed her] dress up." John Doe's memories are different. John Doe didn't lift her onto the bed in an all-fours crawling position. They were already on the bed and just naturally moved into a new position. Further, Jane Roe's own description of her body positioning confirmed she was an active and engaged participant. For instance, she stated she "got up on all fours" in a crawling position on top of the bed. This description reflected the fact she was acting under her own power. She was not on her back or on her stomach where she couldn't twist or crawl away. She was supporting and positioning herself up on all fours to enable the consensual encounter to unfold.

[42]

147.   Jane Roe's second claimed memory, according to the Columbia investigation team report and Jane Roe's Incident Report, was that she and John Doe had a verbal exchange in conversational tones about what they were doing as they walked from one bedroom to the other. Jane Roe did not claim that her words were shouted, spoken with anger or otherwise in a raised voice or confrontational tone, and she didn't remember crying. John Doe did not recall that any such conversations occurred. Further, John Doe did not and does not agree that the two went from the master bedroom with its larger bed to John Doe's bedroom in order to have sexual intercourse in its smaller bed.

148.   Jane Roe's third claimed memory, according to the Columbia investigation team report and Jane Roe's Incident Report, was that she and John Doe engaged in sexual intercourse in the missionary position, but this time in John Doe's bedroom.  Jane Roe claimed that she "put up [her] hands to push [John Doe] away," but [John Doe] "took [her] hands and put them like this," after which Jane Roe demonstrated John Doe pinning down her arms and hands above and to the side of her head. John Doe disagreed, however, that Jane Roe said "no" with either her words or actions. Instead, according to John Doe's testimony, Jane Roe expressed multiple times her consent verbally and by her conduct in numerous ways.

149.   Jane Roe unequivocally and voluntarily provided her consent verbally multiple times. After engaging in foreplay crowded in a small bed, Jane Roe verbally consented to switch to the master bedroom where there was a larger bed.  Jane Roe said "yes" again when John Doe asked if Jane Roe was on birth control and Jane Roe said "yes" again when John Doe asked whether he could "finish inside her."

150.   Jane Roe also unequivocally and voluntarily provided her consent through her conduct in numerous ways, including by accepting John Doe's invitation to go home with him at

2:30 am after a night of kissing and sexual grinding on the Chelsea dance club floor; by mutually and enthusiastically participating in sexual activities in the taxi; and then by willingly and enthusiastically engaging in sexual activities with John Doe in his apartment in two different beds in two different rooms and in multiple different positions (including mutual oral sex and sexual intercourse with Jane Roe on top).

151.    According to John Doe, Jane Roe never said "no" or anything similar to "no" at any time during their entire time together.  If Jane Roe had said "no," John Doe would have immediately complied with her wishes and stopped what they were doing. Jane Roe and John Doe were friends, they were in the same university, and John Doe had and has personal integrity and respect for women.  John Doe would not engage in sexual assault against Jane Roe.

**(v)    John Doe did not cause Jane Roe's bruising; Jane Roe never accused John Doe of specific conduct that could have caused her bruises.**

152.    According to the Columbia investigation team's findings, throughout the entire interview process, Jane Roe made only two specific claims relating to physical force: (1) she was pushed/thrown onto the bed and (2) at one point she placed her hands on John Doe's chest and John Doe pinned her arms and hands above and to the side of her head.  John Doe denied each of these claims but, in any event, there were no bruises on Jane Roe's hands or wrists.  Yet, the Columbia investigation team used the bruises on Jane Roe to find John Doe responsible for sexual assault.  The evidence did not support that finding, and the evidence did not support finding that John Doe caused the bruises.

153.    Jane Roe unequivocally testified in the investigation that she "did not specifically recall physical force being used by [John Doe]." Jane Roe also testified in the investigation that her "strategy" was to not physically resist or try to fight; instead, she claimed to the Columbia

investigation team that her strategy was to reason verbally with John Doe by mentioning his girlfriend.

154.    Jane Roe also testified that she did not know what caused her specific bruises. Throughout the entire disciplinary case, Jane Roe never accused John Doe of specific conduct that could have caused the specific sizes, shapes, locations and colors of her bruises. The only specific allegation -- relating to her arms being held above her head during sex -- could not have caused her specific bruises.

155.    Jane Roe did not describe a violent struggle between her and John Doe.  Rather, Jane Roe claimed that she was unable to resist.  Jane Roe returned to her apartment in the same dress that she and John Doe acknowledged she wore during the entire night, during sexual intercourse and while she was sleeping. There was no testimony from anyone that the dress was even slightly torn, stretched or compromised in any way whatsoever.

156.    John Doe did not know how Jane Roe acquired her bruises. During the Columbia investigation, John Doe could only guess how Jane Roe, who has fair skin, acquired them. Nevertheless, John Doe unequivocally denied that Jane Roe's bruises occurred as a result of their sexual activity.  Jane Roe did have two sexual encounters in two nights; there were possibilities for Jane Roe to have been bruised other than by her sexual activity with John Doe.

157.    According to the hospital nurse's report, seven of Jane Roe's bruises (including the one on her thigh which was the focus of the Columbia investigation team) *already* contained "green," "purple" or "brown" a few hours after Jane Roe had sexual intercourse with John Doe. Bruises do not turn green, purple or brown only a few hours after their trigger event. Thus, whatever caused at least these seven bruises already occurred before Jane Roe went back to John Doe's apartment early Saturday morning.

158.     John Doe's expert witness, a well-respected pathologist, opined that in terms of timing, size, shapes, location, colors and causation, the bruises were not consistent with a violent sexual attack or coerced sexual encounter just a few hours earlier and, additionally, that the sizes and locations of the bruises were not consistent with bruises from the hands and fingers.

**(vi)     Jane Roe attempted to bolster her "fear" narrative by claiming that John Doe's apartment resembled a violent scene the next morning; this claim was demonstrably false.**

159.     The Columbia investigation team found great significance in Jane Roe's account that John Doe's apartment had the appearance of a "violent scene" the next morning because her belongings were scattered.  Jane Roe used this claim to reinforce her story and the Columbia investigation team accepted it without question.

160.     Jane Roe's claim relating to the violent aftermath in John Doe's apartment is contradicted by the objective facts.

161.      *First*, John Doe's apartment contained the typical "after-party" mess created by *Jane Roe's* group of friends the prior evening.

162.     *Second*, there was no testimony that John Doe's furniture was out of place or turned over.

163.     *Third*, Jane Roe's belongings were exactly where she left them earlier that morning: one shoe where she kicked it off near the front door; one shoe a few feet away near John Doe's bedroom, her phone on the couch where John Doe and Jane Roe started kissing; and her backpack (containing her keys and wallet) in John Doe's bedroom where she left it before moving to the master bedroom.

(vii)    **Jane Roe's state of mind and course of conduct later the morning of August 26, 2017, including her texts to her future boyfriend, is inconsistent with a violent sexual assault; pressure was placed upon Jane Roe to report her allegations.**

164.    Jane Roe's course of conduct immediately after she left John Doe's apartment and later during that morning is inconsistent with a violent sexual assault.

165.    At 10:33 am and on her way home after leaving John Doe's apartment, Jane Roe texted her future boyfriend. In her text, Jane Roe informed her future boyfriend that she tried to invite herself over to his apartment at 12:53 am the night after she was intimate with him.   In doing so, Jane Roe explicitly provided insight into her true state of mind at this critical moment in time by including two different types of smiling, happy emojis in her texts: one of these texts was a smiling, happy face and the other was a smiling, happy face with a little suggestive sweat droplet on its brow.  These smiling emojis were embedded in a text that Jane Roe sent after her now-claimed escape from the scene of a sexual assault.

166.    Then, 20 minutes later at 10:53 am, Jane Doe sent two additional texts to the future boyfriend stating: "You wanna hang out today?" and "I really want to see you."

167.    Jane Roe would not be texting happy, smiling emojis if she were emotionally distraught at this moment after leaving the scene of a sexual assault.  Jane Roe would not be sending casual, breezy texts requesting a meet-up later that same day with a man who she was personally interested in if she had just been sexually assaulted, particularly because she admitted to this man that she was "paranoid" and "insecure" about their budding relationship. To the contrary, Jane Roe's texts at 10:33 am and 10:53 am are completely consistent with spending a night out clubbing with John Doe and others, engaging in consensual sexual intercourse with John Doe, having only a few hours of sleep and, then after resting/napping in her room, hoping to hang

[47]

out later that same day with the future boyfriend, a man with whom she was intimate the immediately preceding night.

168.    Neither the Columbia investigation team, nor the Columbia hearing panel, nor the Columbia appellate panel asked Jane Roe about her texts to the future boyfriend before and after the alleged incident, nor did they question Jane Roe about her emojis. Moreover, the Columbia investigation team failed to ask Jane Roe why the 17 texts/calls were completely devoid of reference to fear. John Doe pointed out these differences in his submissions, but the differences were ignored by the Columbia investigation team.

169.    Jane Roe also decided while walking home "to just go into [her] bed and not talk about what occurred the previous night." Jane Roe told investigators that when she returned to her apartment sometime before 11:00 am, the idea of going to the hospital "wasn't something that had crossed her mind." After entering her apartment with her shoes in her hands (because of the "crazy" blisters on her feet), disheveled hair, little sleep and discomfort on her face from walking multiple Manhattan blocks with blistered feet, Jane Roe sat with her cousin for a few moments, said nothing initially according to her cousin and then went alone into her room ready to rest and take a nap.

170.    At 11:02 am, Jane Roe finally received a response text from her future boyfriend declining her attempt to get together that day because he was going to Central Park for another woman's birthday. The telephone log indicates that Jane Roe called him one minute later (and just 10 minutes after her unemotional, breezy text asking him if he wanted to hang out later that same day). The future boyfriend told the Columbia investigation team that Jane Roe was upset and crying hysterically, and that she said she was going to the hospital with her cousin, but she did not tell him why and he did not press the point.

[48]

171.    The Columbia investigation team findings ignore the pressure Jane Roe's cousin placed on Jane Roe.  After Jane Roe went to her bedroom, Jane Roe's cousin admittedly took charge.  According to the Columbia investigation report, her cousin then came into Jane Roe's room and sat down next to Jane Roe on the bed. Her cousin asked about the bruises, but no names were discussed. According to the Columbia investigation report, her cousin eventually guessed what had happened. Jane Roe's cousin testified that she thought she then asked Jane Roe "you were with someone and you didn't want it?" and Jane Roe "nodded" in agreement.

172.    At this point in time, Jane Roe appeared to have experienced regrets about having had sexual intercourse with John Doe.  During the morning after, Jane Roe would have been in a position to consider the two one-night sexual encounters with two non-exclusive friends on two consecutive nights and at that point did not appear to have future romantic prospects with either one of them.

173.    Jane Roe's cousin then researched local hospitals and then went back into Jane Roe's room and pressed Jane Roe to go to the hospital for Jane Roe's "own health and safety," to which Jane Roe ultimately agreed. Jane Roe did not intend to discuss the night before when she got home and did not intend to go to the hospital because she knew that her sexual activities with John Doe were wholly consensual.

174.    Jane Roe asked her cousin to do the talking for Jane Roe at the hospital. It was the cousin therefore, not Jane Roe, who told the nurse that Jane Roe was the victim of a sexual assault and who filled out all of the paperwork at the hospital on behalf of Jane Roe.

175.    The next day, Sunday, August 27, 2017, Jane Roe sat together with her cousin and her future roommate and attempted to reconstruct the events of the prior night, even though neither her cousin nor her future roommate were present or communicating with Jane Roe at any relevant

[49]

time. Similarly, on Monday evening, August 28, 2017, Jane Roe attempted to reconstruct the events of early Saturday morning with her future boyfriend.

176.    Once Jane Roe "recreated" the events with the help of her friends and then told many others, including her mother, the story of her sexual assault, she was subject to the pressure of her friends and mother to file the Incident Report.  Put another way, if Jane Roe's recreated narrative were true (which it is not), then everyone she told would expect her to file the Incident Report to maintain her credibility.

177.    It is difficult to know what motivates people to act in a certain way. We do know that Jane Roe had few friends in the United States before the alleged incident on August 26, 2017, but thereafter Jane Roe became somewhat of a campus folk hero as evidenced by her more than 1,000 Twitter followers who in December 2017 received tweets from Jane Roe about the alleged sexual assault and her travails. Jane Roe also established a boyfriend relationship with someone who had previously ignored her many entreaties that evening.

**C.    John Doe Has Been Wrongly Found Responsible
In A Gender-Biased Process: The Procedural Defects.**

178.    The April 2011 Dear Colleague Letter had ostensibly recognized and the September 2017 Dear Colleague Letter unequivocally recognizes that the procedures adopted by a school such as Columbia covered by Title IX must accord due process to both parties involved.  The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts."  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

179.    Columbia University's one-sided, gender-biased, result-oriented investigation and decision-making process is fundamentally unfair and produced a clearly erroneous result in finding John Doe responsible for non-consensual vaginal intercourse.  The "procedural errors" complained

of by John Doe resulted in an "erroneous outcome" based on erroneous and distorted conception of the facts.

**(i)** **Gender-Based Result-Oriented Dispositive Presumption: the Columbia investigation team inappropriately shifted the burden of proof to John Doe by explicitly presuming that Jane Roe was truthful.**

180.    The Columbia investigation team's findings expressly stated that Jane Roe would not put herself through the ordeal of reporting the incident if it were not true. The findings say that if an individual makes a sexual assault claim and goes through the arduous process, "it is hard to fathom" that the allegations are not true. This statement shifted the burden of proof to John Doe, thereby conveying a fundamental gender-based result-oriented bias against John Doe.  Columbia's sanction letter indicated that the Dean also explicitly believed that this presumption in Jane Roe's favor is appropriate -- that Jane Roe would not pursue her claims unless she was telling the truth.

181.    This presumption that Jane Roe was telling the truth unfairly prejudiced John Doe. For example:

(i)    the Columbia investigation team did not question Jane Roe about her written claim in her Incident Report that her "17" texts to her future boyfriend were evidence of her "fear" even though the content of the texts themselves refuted this carefully written claim;

(ii)    the Columbia investigation team did not ask Jane Roe about the irreconcilable inconsistencies between her testimony and her future boyfriend's testimony about these same texts, about her multiple texts on a prior night out alone when she was not afraid and about her statement that she felt it was safe to go back to John Doe's apartment;

(iii)     the Columbia investigation team did not ask Jane Roe about the irreconcilable inconsistencies between her testimony and the testimony of Witness #5, Witness #6 and Witness #8;

(iv)     the Columbia investigation team did not ask Jane Roe about her explicit statement to Witness #5 that she wanted to stay at the Chelsea dance club alone with John Doe.

182.    This gender-biased result-oriented presumption that Jane Roe was telling the truth virtually guaranteed a finding of responsibility against John Doe, eliminated the possibility of a fair and impartial process and pre-ordained the result.

**(ii)     Gender-Biased Result-Oriented Evaluation of Jane Roe's Credibility: as a result of its presumption that Jane Roe was telling the truth, Columbia University did not critically analyze the fundamental inconsistencies and discrepancies in her story.**

183.    The final Columbia investigation team report characterized the critical question as "which party's version of events is more credible, as the details are irreconcilable." Yet, the Columbia investigation team credited Jane Roe's account even though Jane Roe's Incident Report and her statements to the Columbia investigation team are fundamentally inconsistent with the testimony of Jane Roe's three eyewitnesses relating to her kissing/sexualized activities at the Chelsea dance club, the exculpatory evidence relating to Jane Roe's "fear narrative," the exculpatory evidence relating to Jane Roe's true state of mind set forth in her texts to the future boyfriend soon after leaving John Doe's apartment, and most of the other evidence in the record.

184.    The Columbia investigation team failed to analyze critically Jane Roe's credibility, going so far as to cite Jane Roe's refusal to address the five questions John Doe sought to be asked as a *positive* in assessing her credibility. In presuming that Jane Roe was telling the truth simply because she pursued her complaint, the Columbia investigation team intentionally avoided asking

Jane Roe serious questions that suggested or implied that they did not wholeheartedly embrace her story.

185.    In contrast, John Doe told a consistent narrative of the events that culminated in mutually consensual sexual intercourse between John Doe and Jane Roe. Yet, the Columbia investigation team assailed John Doe's credibility based on relatively insignificant side points.

186.    The only inconsistency the Columbia investigation team found in Jane Roe's testimony was her contention regarding the number of people who rode with her in the first taxi. This was a transparently flimsy attempt to show an even-handed assessment of Jane Roe's credibility even while ignoring all of the inconsistencies and discrepancies between Jane Roe's story and the eyewitness statements and documentary evidence.

187.    Due to its gender-biased result-oriented investigation and presumption, the Columbia investigation team ignored all of the exculpatory evidence, mischaracterized the statements of witnesses, made up quotes on material matters, and misread key elements of the documentary evidence, including the evidence relating to:

(i)     Sexualized activities at the Chelsea dance club: the Columbia investigation team completely ignored, in assessing Jane Roe's credibility, Jane Roe's denial of Jane Roe's and John Doe's mutual sexualized activities at the Club even though the only eyewitnesses confirmed John Roe's testimony.

(ii)    Jane Roe's "fear of John Doe" narrative: the Columbia investigation team spent more than a page describing how the call logs, text messages and audio recording between Jane Roe and her future boyfriend substantiated her "fear of John Doe" narrative. The Columbia investigation team knew it must take this position because Jane Roe's "fear" was a fundamental tenet of her narrative. Jane Roe's "fear of John Doe" narrative goes

straight to the heart of her credibility. Yet, the Columbia investigation team never questioned Jane Roe regarding the overt fundamental inconsistencies and discrepancies between her testimony and the evidence.

(iii) Jane Roe's texts to her future boyfriend the next morning: the Columbia investigation team ignored the happy, smiling emojis and casual texts sent by Jane Roe to her future boyfriend soon after leaving John Doe's apartment, even after John Doe pointed them out in each of his submissions. These happy, smiling emojis shed light on Jane Roe's state of mind at this critical time period.

(iv) The after-party mess in John Doe's apartment: the Columbia investigation team used Jane Roe's account that John Doe's apartment the next morning had the appearance of a "violent scene" the next morning to support its decision, even though the after-party mess resulted from the guests Jane Roe brought to John Doe's apartment and Jane Roe's belongings were scattered where she left them a few hours earlier.

(v) Other exculpatory evidence: the Columbia investigation team ignored all of the other exculpatory evidence and never questioned Jane Roe regarding the condition of Jane Roe's dress, the colors and locations of Jane Roe's bruises, or any of the other overt fundamental inconsistencies and discrepancies pointed out herein. The Columbia investigation team presumed that Jane Roe was telling the truth.

188. The Columbia investigation team treated as a positive in assessing Jane Roe's credibility her "black out memory loss." Jane Roe conceded that she was in a state of "blackout memory loss," she had very little memory of the evening's events and she had even less memory of specific details. Jane Roe does not describe what happened, concisely or otherwise. Instead, she essentially says -- I remember saying "no" but I cannot remember much else because I was in a

state of "blackout memory loss." And, Jane Roe concedes that toward the end of the night her "memory becomes . . . blackout with like glimpses of memory" and that her memory became "weird." She also confessed at one point that because of her blackout memory loss, "I don't even know if [one of the three things at the apartment she says she remembers is] a real memory anymore." Nevertheless, despite Jane Roe's expressed inability to determine which of her memories were real, the Columbia investigation team concluded that her admitted uncertainty serves as corroborative evidence that her "fragments" are inherently credible. The Columbia investigation team did not indicate how it distinguished between what it believed to be Jane Roe's "true" memories and those of Jane Roe's memories that were recreated.

189.    Further, the Columbia investigation team never questioned Jane Roe's credibility even though she admitted that her fragmented "memories" were *created* over the course of several days with the help of her friends/future boyfriend who *were not with her at any relevant time*.

190.    The Columbia investigation team thus applied a gendered double standard: it concluded that Jane Roe's account should be presumed to be accurate because she could not remember what happened, but John Doe's testimony was untruthful because he could not recall specific details on a few relatively insignificant side issues.

191.    Columbia's conclusions regarding Jane Roe's credibility were reached after a gender-biased result-oriented investigation, substantive evaluation of the record and hearing procedure. Jane Roe's credibility could not be accurately determined without questioning Jane Roe about the fundamental inconsistencies and discrepancies between the key tenets of her narrative and the eyewitness statements and documentary evidence. Had the Columbia investigation team conducted a fair and impartial gender-neutral investigation, Columbia would have concluded that the details are not "irreconcilable" and that John Doe had been wrongly and falsely accused.

**(iii)    Gender-Biased Result-Oriented Evaluation of John Doe's Credibility: Columbia presumed that John Doe's testimony was untrue and therefore did consider the consistencies between his testimony and the objective evidence.**

192.    As indicated, the Columbia investigation team said the case turns on credibility. But the Columbia investigation team presumed that Jane Roe's story was truthful and conversely presumed that John Doe's testimony was untruthful where his testimony was in conflict with Jane Roe's.

193.    The Columbia investigation team challenged John Doe's credibility wherever possible, but could only do so based on three minor points.

194.    *First*, the Columbia investigation team spent a *full-page* in its findings assailing John Doe's credibility and for being "deliberately untruthful" because he allegedly stated that Jane Roe was wearing "high-heels."  Despite the Columbia investigation team stating six times John Doe said "high-heels," the investigative report itself says that John Doe said she was wearing "heels," which he clarified as "shoes that had some height."  Jane Roe is fairly tall, her shoes had open backs and open straps in the front (like women's pumps) and were not flat sandals, and John Doe said they looked like heeled shoes from his vantage point.   John Doe's statements relating to Jane Roe's shoes were arguably not error at all.  The Columbia investigation team said what kind of shoes Jane Roe was wearing played a major role in supporting their conclusion that John Doe was not credible.  It is very telling that the Columbia investigation team had to use something this minor to assail John Doe's credibility.

195.    *Second*, the Columbia investigation team attacked John Doe's credibility based on a misrepresentation of what John Doe said about the gas valve in his room.  John Doe told the Columbia investigation team that someone must have bumped into the gas valve to cause the gas leak but never said, as the Columbia investigation team suggested, that Jane Roe must have

bumped it repeatedly or hit her thigh.  This credibility attack was also misconceived because one of John Doe's experts concluded that Jane Roe's shoulder bruise matched the gas valve and that it could have happened from one bump.

196.    *Third*, the Columbia investigation team attacked John Doe's credibility about where he said sexual intercourse occurred. John Doe said he and Jane Roe had intercourse and slept in the larger master bedroom.  Jane Roe's contrary assertion was that the sexual intercourse occurred in John Doe's bedroom where she said they also slept.  The Columbia investigation team assailed John Doe's credibility on this issue, which was a major factor that the Columbia investigation team (and later the Columbia hearing panel) relied on in questioning John Doe's credibility.  The Columbia investigation team went so far as to speculate that John Doe might have opened the gas valve after Jane Roe left, a senseless assertion because John Doe and Jane Roe were sleeping when the gas leak began and such an act would have endangered John Doe, Jane Roe and everyone else in the building.  If John Doe and Jane Roe had spent the night in John Doe's smaller bedroom, the building porter would have come across them when checking on the gas leak.

197.    The fact that the Columbia investigation team found it necessary to invent and overstate facts, elevate minor points into major credibility issues and ignore material exculpatory facts exemplified the Columbia investigation team's bias against John Doe.

**(iv)    Gender-Biased Result-Oriented Evaluation Of The Witnesses: the Columbia investigation team gave the testimony of Jane Doe's after-the-fact witnesses the same weight it gave to the eyewitness testimony.**

198.    The Columbia investigation team report also presented a distorted story because the Columbia investigation team accorded the hearsay statements of all of Jane Roe's after-the-fact "witnesses" the same weight as it gave to the testimony of the actual eyewitnesses in judging the credibility of Jane Roe's and John Doe's narratives.

199.    The Columbia investigation team report devoted 10 of the 44 pages of substantive writeup to the hearsay statements of Jane Roe's after-the-fact "witnesses."   The Columbia investigation team also spent another page in its findings on how Jane Roe's after-the-fact "witnesses" all corroborated Jane Roe's narrative.  These after-the-fact "witnesses" were three of Jane Roe's good friends and their loyalty to Jane Roe was evident from their statements.

200.    The hearsay statements of these after-the-fact "witnesses" were not probative.  The statements were not recounting a spontaneous and unedited first-hand report given soon after an incident by a person who could remember the details of the actual events.  Jane Roe claimed to have no real memory of most of the events that she claims transpired. Instead, these witnesses simply played back the *reconstructed* narrative told to them by Jane Roe, which Jane Roe had admittedly reconstructed with the help of her cousin, her future roommate, her future boyfriend and others who also had no first-hand knowledge of the facts.

201.    Jane Roe's statements to her after-the-fact witnesses were neither spontaneous nor unrehearsed and, therefore, should not be considered good corroborative evidence. Under the circumstances, the fact that these after-the-fact "witnesses" were able to repeat back to the Columbia investigation team the unspontaneous and carefully reconstructed narrative told to them by Jane Roe should have no corroborative weight.

202.    The Columbia investigation team, however, cited the statements of these after-the-fact "witnesses" as corroboration for the credibility of Jane Roe's narrative.  For one example, the Columbia investigation team thought it particularly relevant that some of these after-the-fact witnesses mentioned the "fear of John Doe" part of Jane Roe's narrative, even though this narrative was an after-the-fact creation that is completely contradicted by actual eyewitnesses and the documentary evidence in the record.

203.    The statements of these after-the-fact witnesses were extraordinarily prejudicial because some of these witnesses made statements about John Doe's actions that not even Jane Roe told to her cousin, her future roommate, her future boyfriend or the Columbia investigation team. Yet, the Columbia investigation team conveniently ignored the fact that the testimony of these after-the-fact "witnesses" went further than Jane Roe's testimony and characterized John Doe's actions in provocative and inflammatory terms that Jane Roe herself never said to the Columbia investigation team.

### (v)    Gender-Biased Result-Oriented Shift Of Burden Of Proof On Jane Roe's Bruises: Columbia improperly shifted to John Doe the burden of proving that he did not cause Jane Roe's bruises.

204.    According to the Columbia investigation report, John Doe was required to prove that he did not cause Jane Roe's bruises. Jane Roe did not know how she obtained her bruises and provided no evidence on this question.  Because Jane Roe was uncertain, the Columbia investigation team shifted to John Doe the burden of explaining the causes of Jane Roe's bruises. When John Doe indicated he had no idea how Jane Roe acquired her bruises, the Columbia investigation team held this failure against him, even though: (i) the bruises were not consistent with a coerced sexual assault, (ii) the location of the bruises were inconsistent with Jane Roe's testimony, and (iii) a number of the bruises, by coloration, predated John Doe's and Jane Roe's sexual activities earlier that same morning.  That the Columbia investigation team concluded that Jane Roe's bruises must have been caused by John Doe reflected its shifting of the burden of proof to John Doe.

**(vi)    Gender-Based Result-Oriented Evaluation Of Experts: the Columbia investigation team refused to consider the expert opinions on the two medically-related issues presented.**

205.    Upon receiving the draft Columbia investigation team report, John Doe realized that the incident raised two medically-related issues. One concerned the nature of, and cause for, Jane Roe's bruises and the second concerned the ramifications of Jane Roe's self-reported "blackout memory loss." John Doe promptly asked the Columbia investigation team for permission to solicit the views of expert witnesses to evaluate these issues.  John Doe saw from the record that Jane Roe had intimate relations with her future boyfriend the evening before and sought the assistance of an expert to try to pinpoint the timing and cause for her bruises.  John Doe needed Columbia's consent to seek expert advice because John Doe was constrained under Columbia procedures from disclosing documents to third parties without consent.

206.    After five weeks of foot-dragging by the Columbia investigation team, John Doe received permission to, and ultimately did, submit expert reports on these issues from two well-regarded and distinguished medical experts.  Each of John Doe's expert opinions were grounded in medically-based findings and medically-based expertise.  John Doe's bruising expert confirmed that in terms of their timing, size, shapes, locations, colors and causation, Jane Roe's bruises were not indicative of a sexual assault.

207.    John Doe's memory expert raised serious questions about the credibility of Jane Roe's reconstructed memory.  According to the memory expert, a highly-qualified expert on memory who reviewed the record and provided an expert report in this matter, Jane Roe demonstrates a characteristic pattern described in the academic literature. Specifically, due to her professed blackout, Jane Roe felt compelled to fill in the gaps in her story and recreated her memories. Jane Roe admitted she did exactly this -- filled in the gaps in her story and recreated

her memories -- with the help of at least three individuals over the following days and weeks. The three individuals were not with Jane Roe during the events and therefore could not say what actually happened. Thus, the memory expert concluded that Jane Roe's "memories" are tainted and distorted by the conjecture of her friends; therefore, Jane Roe's testimony was unreliable.

208.    Despite the impressive credentials of John Doe's experts and their carefully considered expert reports, the Columbia investigation team concluded that the expert reports were not reliable because the experts were paid for by John Doe.

209.    If the Columbia investigation team were unwilling to consider John Doe's expert reports, it should have retained its own experts or at least addressed the underlying issues in its findings. Yet, the Columbia investigation team made no effort to independently seek expert advice on these technical, scientific issues.

210.    While the expert reports were included in the record for the Columbia hearing panel's consideration, the Columbia investigation team clearly dismissed their significance.

**(vii)    Gender-Biased Result-Oriented Right To Cross-Examination: Jane Doe was never asked the many questions raised by John Doe.**

211.    Columbia did not permit John Doe to question Jane Roe, thereby depriving John Doe of the right to challenge his accuser. The Columbia investigation team eventually gave John Doe the opportunity to propose questions to be asked to Jane Roe; however, this occurred after the Columbia investigation team had already issued its draft report.  John Doe proposed five questions (in addition to the dozens of questions raised by John Doe's March 13, 2018 written response), but Jane Roe refused to even listen to the questions much less answer them.

212.    As noted, the Columbia investigation team believed that Jane Roe's failure to even listen to the questions was a *positive* in assessing her credibility because it reflected her frustration about the length of the process.

213.    John Doe initially proposed only five questions because John Doe believed that, as the Columbia investigation team was charged with conducting a full and fair investigation, the investigation team would not need prompting to ask the many unanswered questions raised by the inconsistencies between Jane Roe's narrative, the statements of other witnesses and the documentary evidence.  Numerous obvious unanswered questions were highlighted in John Doe's submissions to the Columbia investigation team.  It turned out, however, that John Doe's assumption was mistaken; the Columbia investigation team was content to rest on its incomplete record, and the burden was entirely on John Doe to pose written questions to fill these investigation gaps.

214.    Before the hearing, John Doe sought to have the Columbia hearing panel ask some of the many questions that the Columbia investigation team failed to ask.  Again, John Doe's request was refused.  Instead, the Columbia hearing panel just asked Jane Roe the five written questions that had been previously propounded by John Doe. Jane Roe grudgingly responded to the Columbia hearing panel on these five questions. But there was no follow up from the Columbia hearing panel and no other questions asked of Jane Roe.

### (viii)   Gender-Biased Result-Oriented Investigation Report: the form and layout of the Columbia investigation team report obscure the inconsistencies and discrepancies between Jane Roe's testimony and the rest of the evidence.

215.    The form and content of the Columbia investigation team report buried the investigation deficiencies of the Columbia investigation and obscures the fact that the Columbia investigation team simply accepted Jane Roe's narrative uncritically without asking proper follow-up questions either about Jane Roe's credibility issues or the overt fundamental inconsistencies and discrepancies raised by the eyewitness statements and documentary evidence. These procedural and investigation flaws made it impossible, given the speed with which the

[62]

Columbia hearing panel reached its conclusions, for the Columbia hearing panel to identify the inconsistencies and properly evaluate the Columbia investigation team's findings.

216.    The form and content of the Columbia investigation team's draft report presents a distorted picture of the witness testimonies and evidence for a number of reasons, including:

(i)    the draft report strung together party-by-party and witness-by- witness interview summaries and credibility assessments with few citations to the record;

(ii)    there was no summary analysis providing a clear understanding of each party's narrative, no synthesis of each party's multiple interviews, and no reconciliation of the testimony of all the witnesses and evidence;

(iii)    there was no critical analysis of the numerous overt fundamental inconsistencies and discrepancies between Jane Roe's testimony and the testimony of the eyewitnesses and the documentary evidence;

(iv)    10 of the 44 pages are devoted to Jane Roe's after-the-fact witnesses (fifteen pages including her cousin's account) who heard Jane Roe's statements after they were reconstructed;

(v)    The hearsay statements of all of Jane Roe's after-the-fact "witnesses" are granted the same weight as the weight given to the testimony of the actual eyewitnesses in judging the credibility of Jane Roe's and John Doe's narratives;

(vi)    the hearsay statements of Jane Roe's after-the-fact "witnesses" were highly prejudicial because these witnesses made statements about John Doe's actions that were conjecture and did not reflect what Jane Roe told to her cousin, her future roommate, her future boyfriend or to the Columbia investigation team; and

(vii)    the Columbia investigation team ignored the fact that the hearsay statements

of Jane Roe's after-the-fact "witnesses" went far beyond all of the other evidence when assessing the facts.

### (ix)   Gender-Biased Result-Oriented Decision-Making Process: the Columbia investigation team refused to consider John Doe's written response.

217.   The Columbia investigation team never considered, much less addressed, the many matters raised in John Doe's March 13, 2018 report, and never questioned Jane Roe about them.

218.   After John Doe received the Columbia investigation team's draft report, John Doe submitted a written response on March 13, 2018 that highlighted many of the inconsistencies and discrepancies in Jane Roe's narrative. While John Doe's March 13, 2018 submission provided the Columbia investigators with a roadmap for further investigation and inquiry, the Columbia investigation team ignored relevant questions and information designed to shed light on its inquiry and showed no interest in questioning Jane Roe about the highlighted issues.

219.   Instead, the Columbia investigation team castigated John Doe for submitting his response, indicating to John Doe that he was limited to making corrections and adding information to the draft report and that it was not appropriate for John Doe to comment on, and raise questions about, Jane Roe's narrative and evidence at that time or to point out the inconsistencies between Jane Roe's narrative and other witness statements and the documentary evidence. The Columbia investigation team further indicated that any submission of the type offered by John Doe was premature and, when appropriate, would be limited to only ten single spaced pages addressed to the Columbia hearing panel once the Columbia investigation team had finalized its findings.

**(x)      Gender-Biased Result-Oriented Decision-Making Process: John Doe was not provided with a meaningful opportunity to respond to the Columbia investigation team final report and the Columbia hearing panel rushed to judgment.**

220.    John Doe received the Columbia investigation team's final report on Thursday evening, April 12, 2018, and was given until only Tuesday April 17, 2018 to provide his written response. John Doe was given a mere three working days to respond to a ninety-plus page single-spaced report plus several hundred pages of exhibits. Further, John Doe's response was limited to only ten single-spaced pages. This five-day time period and page limitation gave John Doe insufficient time and space to draft a comprehensive response. Still, John Doe met the deadline and on Tuesday, April 17, 2018, John Doe submitted a written response to the final Columbia investigation team report stating he had been wrongly and falsely accused and giving his reasons for this conclusion. The page limitation, however, made it impossible for John Doe to point out the many errors in the final report.

221.    The Columbia hearing panel (i) received the ninety-plus-page Columbia investigation team report and attachments thereto, together with the responses of John Doe and Jane Roe, on April 18, 2018, (ii) held a "hearing" the next day on April 19, 2018 and (iii) rendered a decision based on the Columbia investigation report the following day on April 20, 2018. The Columbia hearing panel did not have the time to undertake a fair and thoughtful review of the entire record, but rather completely relied on the flawed report of the Columbia investigation team.

**(xi)     Gender Biased Result-Oriented Decision-Making Process: gender bias at the hearing and in the decision-making.**

222.    The failure of the Columbia investigation team to address the fundamental inconsistencies and discrepancies between the key tenets of Jane Roe's narrative and the

eyewitness statements and documentary evidence carried over and effectively prevented the Columbia hearing panel from making an informed decision.

223.    The Columbia hearing panel did not ask Jane Roe about the overt fundamental discrepancies and inconsistencies between Jane Roe's narrative and the statements of her witnesses and documentary evidence, despite the fact that John Doe highlighted them to the Columbia hearing panel and explicitly sought to have the Columbia hearing panel question Jane Roe on these points.

224.    Jane Roe made inflammatory allegations in her written response submitted to the Columbia hearing panel and in her oral statement to the Columbia hearing panel that Jane Roe had not previously made to the Columbia investigation team during the entire seven-month "investigation." These allegations were not questioned by and were simply presumed to be true by the Columbia hearing panel and were severely prejudicial to John Doe, who had no meaningful opportunity to respond to them.  As noted, Columbia also rebuffed John Doe's efforts to have his questions of Jane Roe answered, even though evaluation of the evidence hinged on Jane Roe's credibility.

225.    The Columbia hearing panel, without a critical write-up from the Columbia investigation team, without asking its own questions, and without adequate time to go through the record, had by necessity placed reliance on the Columbia investigation team's findings and rubber-stamped the Columbia investigation team findings.  By letter dated April 20, 2018, the Columbia hearing panel announced its finding that John Doe was responsible for sexual assault involving two instances of non-consensual sexual intercourse.  As noted, the Columbia hearing panel decision came only two days after the Columbia hearing panel received the voluminous written record and only one day after the hearing.  The sanction of expulsion was issued four days after

the Columbia hearing panel responsibility decision.   This represents a gender-biased rush to judgment that was unfairly prejudicial to John Doe.

**(xii)     Columbia has a gender-biased victim-oriented process.**

226.    Columbia has a victim-centered and gender-biased process in which an accused male student is prosecuted under a presumption of guilt, improperly placing the burden of proof on the male student, and evaluates evidence according to gender-biased assumptions to reach results finding males "responsible" to achieve "justice" according to "gender-identity politics." The Columbia investigation report stated this explicitly, saying: "*It is hard to fathom why the Complainant would subject herself to a long and invasive process…if she merely engaged in consensual sex but regretted it afterwards*" [emphasis supplied]. Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Columbia on the basis of his sex.

227.    To say the process is "victim-centered, but not gender biased" is: (i) trumping reality with a theoretical but non-existent possibility of females being both victims and accused and males being both victims and accused; and (ii) ignoring what these university sexual misconduct tribunals have been about.   If the system is victim-centered, it is not neutral and impartial; and the reality at Columbia and elsewhere is that males are the "accused" respondents and females are the "victim" complainants. Furthermore, the conception of these campus sexual misconduct tribunals has been to protect women. The April 2011 Dear Colleague Letter premised the need for colleges to discipline sexual misconduct, using a preponderance of the evidence standard, with the false statistic that 1 in 5 *women* on campus were victims of sexual assault, https://www2.ed._gov/about/offices/list/ocr/letters/colleague-201104.html; the real number of college women assault victims is .03 in 5. *Rape and Sexual Assault Victimization among College*

[67]

*Age Females, 1995-2013* (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf. To deny the female protectionist nature of campus sex tribunals is not law, but a misconceived political effort to obscure the gender-identity politics at work, and openly promoted outside the courtroom, and undercut fairness for respondents. Universities such as Columbia can deny all they want about being "pressured" (never mind the federal funding involved), but universities have acted aggressively in implementing measures to specifically protect female "survivors" and "victims."

228.    The totality of circumstances establishes that Columbia has demonstrated a pattern of inherent and systematic gender bias and discrimination against accused male students.  Upon information and belief, all students that have been suspended or expelled from Columbia for sexual misconduct have been male.

229.    Male respondents in sexual misconduct cases at Columbia are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the sufficiency of the evidence.

**D.       John Doe Received An Excessive Sanction Based In Part on Gender Bias.**

230.    An "unduly severe penalty" was imposed in this case because John Doe, who had no prior disciplinary history and who believed he had consent for the sexual conduct that occurred, was expelled from Columbia. This "unduly severe penalty" was affected by John Doe's male gender.  This decision has career-ending consequences for John Doe.

231.    Columbia University imposed an excessive sanction which deprived John Doe of a Columbia graduate school degree even though he had essentially completed the program. The Columbia sanction letter stated that the Dean had reviewed the entire file and had concluded that in light of the serious nature of the violations, John Doe should be expelled from the Columbia

graduate school program.  The Dean's review, consultations and decision had to have occurred in the four days over the Easter weekend between Friday, April 20, 2018 and Tuesday, April 24, 2018.

232.    The totality of the circumstances establish that Columbia's decision to order an unduly severe expulsion was affected by John Doe's male gender.  Columbia's decision to order sanctions that were unduly severe did not take into sufficient account that John Doe had a previously unblemished disciplinary record at Columbia and presumed that Columbia would have an unsafe environment by the presence of a male student who was in fact on campus for two school years without incident.

**E.    Monetary and Injunctive Relief.**

233.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

234.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, ordering the ending of the expulsion, enjoining Columbia from preventing John Doe doing what is necessary to receive a graduate degree from Columbia and granting clearing of John Doe's transcript of the disciplinary record.

**SECOND CAUSE OF ACTION:**
**(State Law Breach of Contract)**

235.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

[69]

236.    Columbia created an express and/or implied contract under New York law when John Doe accepted an offer of admission to Columbia University and paid the tuition and fees.

237.    Columbia Policy provides that students are to have a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed.  Columbia breached its contract with John Doe when it failed to conduct a fair and impartial process that treated John Does and Jane Roes equally and when it failed to adhere to the presumption of innocence of the respondent, including by not using the proper burden of proof standard by effectively shifting the burden of proof to John Doe, by precluding John Doe's expert witnesses, and by failing to question Jane Roe about the obvious material fundamental inconsistencies and discrepancies between her narrative and the statements of her witnesses and the documentary evidence she provided.

238.    Based on the aforementioned facts and circumstances, Columbia breached its express and/or implied contract with John Doe because Columbia breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe.  Columbia failed its duty of good faith and fair dealing when it committed the procedural and substantive errors complained of above, meted out a disproportionate sanction notwithstanding the flawed process and found John Doe responsible despite the lack of evidence in support of Jane Roe's allegations of sexual misconduct.

239.    John Doe is entitled to recover damages for Columbia's breach of the express and/or implied contractual obligations described above.  As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

240.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### THIRD CAUSE OF ACTION:
### (State Law Promissory Estoppel)

241.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

242.     Columbia's Policies constitute unambiguous representations and promises that Columbia should have reasonably expected to induce action or forbearance on the part of John Doe.

243.     Columbia expected or should have expected John Doe to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives, to have his health, safety, welfare and human rights protected, to have any claims brought against him under the Policies be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly.

244.     John Doe reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Columbia, by choosing to attend Columbia rather than other schools of equal caliber.

245.     These express and implied promises and representations made by Columbia must be enforced to prevent substantial injustice to John Doe.

246.     Based on the foregoing, Columbia is liable to John Doe based on promissory estoppel.

247.     As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation,

psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

248.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Columbia as follows:

(i)     on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Columbia awarding John Doe:

> (a)     damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

> (b)     an injunction vacating John Doe's disciplinary findings and decision, enjoining violations of Title IX in the process of investigating and adjudicating sexual misconduct complaints, ordering the ending of the expulsion, enjoining Columbia from preventing John Doe doing what is necessary to receive a graduate degree from Columbia and granting clearing of John Doe's transcript of the disciplinary record;

(ii)     on the second cause of action for state law breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action for state law promissory estoppel, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iv)     awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff John Doe demands a trial by jury of all issues presented herein that are triable by a jury.

**Dated: New York, New York**
**        March 12, 2020**

                              **NESENOFF & MILTENBERG, LLP**

                              **By:** _/s/ Philip A. Byler_
                              **Andrew T. Miltenberg, Esq.**
                              **Stuart Bernstein, Esq.**
                              **Philip A. Byler, Esq.**
                              **363 Seventh Avenue, Fifth Floor**
                              **New York, New York 10001**
                              **(212) 736-4500**
                              amiltenberg@nmllplaw.com
                              sbernstein@nmllplaw.com
                              pbyler@nmllplaw.com

                              *Attorneys for Plaintiff John Doe*